The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
July 30, 2020

## 2020COA117

**No. 17CA0999, *People v. Thompson* — Criminal Procedure —
Postconviction Remedies; Criminal Law — Content of
Application for DNA Testing**

A division of the court of appeals considers whether Crim. P.

35(c) authorizes postconviction DNA testing.  The division concludes

that, while section 18-1-413(1), C.R.S. 2019 may entitle a defendant

to testing if he satisfies the statutory criteria, Crim. P. 35(c) does

not independently authorize such testing.

COLORADO COURT OF APPEALS      **2020COA117**

Court of Appeals No. 17CA0999
City and County of Denver District Court No. 93CR2979
Honorable Brian R. Whitney, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Larry Allen Thompson,

Defendant-Appellant.

ORDERS AFFIRMED

Division III
Opinion by JUDGE BERGER
Furman and Grove, JJ., concur

Announced July 30, 2020

Philip J. Weiser, Attorney General, Brittany L. Limes, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Christopher Gehring, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     In 1994, a jury found defendant, Larry Allen Thompson, guilty of first degree murder.  Police discovered the victim in an alley wrapped in a blanket, mattress cover, and electrical cord.  He had been stabbed more than forty times.

¶ 2     In this postconviction proceeding, Thompson's second, he appeals the postconviction court's order denying DNA testing of the blanket, mattress cover, electrical cord, and the victim's clothes.  He contends that the court erred in denying his requests for DNA testing under section 18-1-413, C.R.S. 2019, and Crim. P. 35(c).  He also appeals the order denying his various ineffective assistance of counsel claims as to his trial counsel and his first postconviction counsel.

¶ 3     We hold, as a matter of first impression, that Crim. P. 35(c) does not authorize postconviction DNA testing.  We further agree with the postconviction court that Thompson failed to satisfy the actual innocence standard under section 18-1-413, so he is not entitled to DNA testing under that statute.  Finally, we conclude that the postconviction court properly denied his ineffective assistance of counsel claims.  Accordingly, we affirm the postconviction court's orders.

## I. Relevant Facts and Procedural History

### A. Evidence at Trial

¶ 4    The prosecution presented evidence that, although Thompson lived in Portland, Oregon, with his wife, he was in Denver, caring for his mother, at the time of the murder. Thompson stayed in the same apartment complex as the victim, and he and his brother regularly purchased crack cocaine from the victim. The victim's girlfriend testified about animosity between Thompson and the victim over drug dealings.

¶ 5    Thompson confessed to four people that he murdered the victim, and all four testified at trial. One witness was Thompson's wife. She testified that Thompson had told her that he and his brother were upset with the victim for selling them diluted crack cocaine, so they decided that the victim had "to die today." Thompson also told her that his brother held the victim down while Thompson stabbed him, and that Thompson accidentally cut himself on his wrist during the altercation. Enraged by the cut, Thompson stabbed the victim "over and over." Thompson and his

brother "rolled the victim up in something," put the body in the brother's van,[1] and dumped him in an alley.

¶ 6    Another witness testified that Thompson told him that he had stabbed a drug dealer in Denver. Still another said that Thompson told him he had murdered someone. The fourth witness testified that Thompson told him that, while he was in Denver, he had killed the person who cut him on the wrist.

¶ 7    On the day that police discovered the victim's body, Thompson went to a Denver hospital for treatment for a cut to his wrist. A doctor testified at trial that Thompson's cut was consistent with a stab wound. Thompson testified differently; he said that the cut on his wrist came from a broken piece of glass.

¶ 8    The prosecution also presented scientific evidence to the jury to establish that the blood found on a carpet in the van likely came from the victim.

---

[1] At various points in the record, the vehicle used to transport the victim's body is referred to as a truck and as a van. This distinction makes no difference to our analysis.

## B. First Postconviction Proceeding

¶ 9 DNA testing conducted after Thompson's trial revealed that the bloodstain in the van did not belong to the victim, contrary to the prosecution's arguments and evidence at trial. After this came to light, Thompson's first postconviction counsel moved for a new trial based on newly discovered evidence under Crim. P. 35(c)(2)(V). Thompson's first postconviction counsel also asserted eight ineffective assistance of trial counsel claims. The first postconviction court denied the eight ineffective assistance claims after a hearing.

¶ 10 That postconviction court also concluded that the new DNA evidence was insufficient to warrant a new trial. The court reasoned that, although the newly discovered evidence was significant, when considered in combination with all the other evidence, it would not likely have resulted in an acquittal — particularly given Thompson's four confessions. On that basis, the court concluded that Thompson's argument was "too great a reach."

¶ 11 For seven reasons, a division of this court affirmed the first postconviction court's order:

First, the evidence established that defendant and the victim knew each other well and lived "very close" to each other.

Second, they had a relationship pertinent to the case: defendant regularly purchased drugs from the victim. Indeed, defendant admitted that he purchased drugs from the victim during the time frame in which the murder occurred.

Third, defendant had a motive to kill the victim. The victim's girlfriend testified that there was animosity between defendant and the victim because of problems arising out of their drug transactions. . . .

Fourth, while living in Portland after the murder, defendant admitted to his wife that he had murdered the victim. Defendant's wife testified that defendant provided explicit details about the killing, including how his brother held the victim while defendant stabbed the victim; how the victim struggled, causing defendant to cut himself on the wrist; how this cut enraged defendant and led him to stab the victim "over and over"; and how they disposed of the body.

. . . .

Fifth, while living in Portland, defendant also made admissions to three men about the killing. . . .

Sixth, physical evidence corroborates this testimony. On the same day that the police found the victim's body, shortly after the victim was slain, defendant sought treatment at Denver General Hospital for the cut on his

wrist. This cut was consistent with the type of wound one might receive from a knife. . . .

Seventh, the prosecution's closing arguments focused on the testimony from defendant's wife, the three men, and the cut on defendant's wrist. The prosecutors mentioned the results of the tests on the carpet, but that evidence was used to corroborate defendant's various admissions; it did not serve as the centerpiece of the prosecution's case.

*People v. Thompson,* slip op. at 9–11 (Colo. App. No. 06CA2270, Sept. 10, 2009) (not published pursuant to C.A.R. 35(f)). Ultimately, that division concluded that the blood stain evidence was "corroborative of, but not crucial to, defendant's guilt." *Id.* at 11. The supreme court denied certiorari, and this court issued the mandate.

### C. Second Postconviction Proceeding

¶ 12 Years later, Thompson again moved for postconviction relief under Crim. P. 35(c)(2)(V) based on newly discovered evidence.[2] He requested additional DNA testing of the victim's clothing, the mattress cover, the blanket, and the extension cord, on the theory that there was a strong possibility that the actual perpetrator's DNA

---

[2] There is no time bar on motions for postconviction relief from class 1 felony convictions. § 16-5-402(1), C.R.S. 2019.

6

was on those items, but that Thompson's DNA was not. Later, Thompson moved for preservation of evidence and DNA testing under section 18-1-413.

¶ 13     The second postconviction court first denied Thompson's motion for postconviction relief based on newly discovered evidence because it was premature.

¶ 14     Thompson again moved for a new trial based on newly discovered evidence, this time based on an expert opinion that the cut on his wrist was not caused by a knife but was instead caused by a piece of glass (as Thompson had testified at trial). Thompson also alleged that trial counsel was ineffective for failing to present such an expert opinion at trial, and that postconviction counsel was ineffective for failing to investigate this theory and for failing to raise this issue in the first postconviction motion.

¶ 15     The second postconviction court held a hearing on Thompson's motion for DNA testing of various items that had not been previously tested. Experts hired by both Thompson and the prosecution testified about DNA testing and the possible results. The court denied Thompson's motion in a thorough written order, concluding that Thompson failed to show that additional DNA

testing would prove his actual innocence, as required by section 18-1-413.

¶ 16    The postconviction court held a separate hearing on Thompson's newly discovered evidence and ineffective assistance of counsel claims regarding the wrist-laceration theory. The court denied Thompson's newly discovered evidence claim because evidence regarding "the source of the scarring was available both at trial and at the prior 35(c) hearing" such that the wrist-laceration theory was "not 'evidence that could not have been discovered previously through the exercise of due diligence' as it was known and knowable at the time of trial." Thompson does not appeal the denial of this newly discovered evidence claim.

¶ 17    The court also denied all of Thompson's ineffective assistance of counsel claims pertaining to the wrist-laceration theory. The court reasoned that the claims pertaining to trial counsel were procedurally barred as successive because they could have been raised in the first postconviction motion. As to his first postconviction counsel's claimed ineffectiveness, the court concluded that Thompson did not prove prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984).

## II. Analysis

### A. Order Denying Additional DNA Testing

¶ 18 Thompson first contends that the postconviction court erred by denying his motion for additional DNA testing under section 18-1-413.

#### 1. We Have Jurisdiction to Review the Order

¶ 19 The Attorney General argues that this court does not have jurisdiction to review the order denying DNA testing because Thompson did not timely appeal it. We reject the Attorney General's argument.

¶ 20 Jurisdiction is a question of law that we review de novo. *People v. Vargas-Reyes*, 2018 COA 181, ¶ 9. We lack jurisdiction to hear untimely appeals. *People v. Baker*, 104 P.3d 893, 895 (Colo. 2005). "[I]n a criminal case the notice of appeal by a defendant shall be filed in the appellate court and an advisory copy served on the clerk of the trial court within 49 days after the entry of the judgment or order appealed from." C.A.R. 4(b)(1).

¶ 21 It was unclear whether the postconviction court's order denying additional DNA testing was a final order. Indeed, in a later order the postconviction court stated, "[t]he Court notes that

9

Defendant may appeal [the order denying DNA testing] once the pending 35(c) hearing is resolved."[3]  Under these circumstances, we conclude that Thompson's appeal is timely because the postconviction court entered an interlocutory order, not a final order.

¶ 22    Alternatively, even if the order denying DNA testing was a final appealable order, we conclude that we have jurisdiction to hear the appeal under the unusual circumstances doctrine.  This doctrine "may apply if a party reasonably relies and acts upon an erroneous or misleading statement or ruling by a trial court regarding the time for filing post-trial motions."  *Converse v. Zinke*, 635 P.2d 882, 886 (Colo. 1981).  The postconviction court told counsel that he could appeal "once the pending 35(c) hearing is resolved"; any error in failing to timely appeal the order was made in reasonable reliance on the postconviction court's statement.

---

[3] The quoted language appears in the court's order denying Thompson's request to stay the court's order on DNA testing.

### 2. The Postconviction Court Correctly Denied Thompson's Motion for Additional DNA Testing

¶ 23 Thompson argues that additional DNA testing would demonstrate his actual innocence, and that the postconviction court erred by concluding otherwise.

¶ 24 Review of a postconviction motion for DNA testing presents a mixed question of fact and law. *People v. Young*, 2014 COA 169, ¶ 37. We review the postconviction court's factual findings for clear error and the court's legal conclusions de novo. *Id.*

¶ 25 Section 18-1-413(1) prohibits a court from ordering postconviction DNA testing "unless the petitioner demonstrates by a preponderance of the evidence that . . . [f]avorable results of the DNA testing will demonstrate the petitioner's actual innocence."[4] Actual innocence is "clear and convincing evidence such that no reasonable juror would have convicted the defendant." § 18-1-411(1), C.R.S. 2019.

¶ 26 We agree with the postconviction court that the absence of Thompson's DNA on the mattress pad, blanket, extension cord, and

---

[4] A petitioner must also demonstrate three other statutory elements that are not at issue in this appeal. § 18-1-413(1), C.R.S. 2019.

11

victim's clothes would not constitute "clear and convincing evidence such that no reasonable juror would have convicted the defendant." DNA testing of these items would not necessarily or logically rebut other strong evidence of Thompson's guilt: (1) his confessions to four different people; (2) the fact that he lived in the same apartment complex as the victim and was in Denver at the time of the murder; (3) his acquaintance with the victim; (4) the fact that he had a motive, according to his wife and the victim's girlfriend, because Thompson had received bad drugs from the victim; and (5) the cut on his wrist, for which he received treatment at a Denver hospital on the same day that police found the victim's body.

¶ 27 Furthermore, the court credited the prosecution's expert, who testified that Thompson's DNA could "be missed due to overarching DNA evidence from the victim . . . and the 'needle' of locating bodily fluid of [Thompson] in a 'haystack' of the clearly overwhelming amount of bodily fluids on the crime scene."

¶ 28 The court ruled that "[b]ecause so many factors can influence the outcome, the court cannot find by a preponderance of the evidence that a finding of the absence of [Thompson's] DNA would demonstrate his actual innocence." This factual finding and the

12

resulting legal conclusions are amply supported by the record and we cannot disturb them.

### 3.  Thompson's Other Arguments Regarding DNA Testing Fail

¶ 29  Thompson next argues that the court erred by requiring him to proceed exclusively under the DNA testing statute, sections 18-1-411 to -416, C.R.S. 2019, instead of allowing him to claim an independent right to DNA testing under Crim. P. 35(c).  We disagree.

¶ 30  The meaning of a court rule is a question of law that we review de novo.  *Mercantile Adjustment Bureau, L.L.C. v. Flood*, 2012 CO 38, ¶ 30.

¶ 31  It is unnecessary for us to decide whether sections 18-1-411 to -416 constitute the exclusive basis on which a postconviction court can order DNA testing.  The only other basis posited by Thompson for DNA testing is Crim. P. 35(c).  So, we only need to decide whether Crim. P. 35(c) authorizes a DNA testing order.  We hold that it does not.

¶ 32  The plain language of Crim. P. 35(c), promulgated by the supreme court, does not authorize discovery procedures, including DNA testing.  Had the supreme court intended to allow such

discovery in connection with a Crim. P. 35(c) motion, it easily could have said so.  It did not.

¶ 33     True, Crim. P. 35(c)(2)(V) permits a motion based on newly discovered evidence, but that section does not address or authorize the discovery of such evidence — DNA or otherwise.  Rather, "[t]o succeed on a motion for a new trial [based on newly discovered evidence], the defendant should show that *the evidence was discovered* after the trial."  *People v. Rodriguez*, 914 P.2d 230, 292 (Colo. 1996) (emphasis added) (quoting *People v. Gutierrez*, 622 P.2d 547, 559 (Colo. 1981)).  Simply put, Crim. P. 35(c) is not a discovery mechanism to find new evidence, but, rather, prescribes a procedure to present such evidence when it has been obtained through other sources.

¶ 34     In his notice of supplemental authority, Thompson cites *Bresnahan v. District Court* for the proposition that a Crim. P. 35(c) proceeding is controlled by criminal procedural rules with respect to any permitted discovery.[5]  164 Colo. 263, 434 P.2d 419 (1967).

---

[5] Obviously, *Bresnahan v. District Court*, 164 Colo. 263, 434 P.2d 419 (1967), decided more than fifty years ago, is not "new" authority within the meaning of C.A.R. 28(i).  Nevertheless, because one of the

14

While that is true, *Bresnahan* does not entitle a defendant to any postconviction discovery under Crim. P. 35(c).

¶ 35    There, the Colorado Supreme Court addressed whether criminal or civil procedural rules applied to taking depositions in connection with a postconviction deposition.  The court said, "[a] 35(b) hearing is not a civil proceeding.  Rather, it is but one phase of a criminal proceeding.  Such being the case, then, the taking of any deposition to be used in a 35(b) hearing is governed by our Rules on Criminal Procedure . . . ."[6]  *Id.* at 268, 434 P.2d at 421.  Thus, *Bresnahan* stands only for the proposition that *if* depositions are taken in a Crim. P. 35(c) proceeding, they must be taken in accordance with criminal, not civil, procedural rules.  *See id.* Nothing in *Bresnahan* authorizes any particular discovery in postconviction proceedings, much less DNA testing.

¶ 36    Next, Thompson argues that the postconviction court erred by denying DNA testing because he needed it to prove *Strickland*

_____

judges on this division asked counsel at oral argument whether he had any supporting authority on this point, we exercise our discretion to address, and reject, Thompson's reliance on that case.
[6] Many of the postconviction remedies now provided for in Crim. P. 35(c) were previously found in Crim. P. 35(b).  *People v. Wiedemer*, 852 P.2d 424, 430 n.6 (Colo. 1993).

prejudice, and because his first postconviction counsel allegedly was ineffective for not requesting that testing. These arguments fail because, as stated previously, Crim. P. 35(c) does not provide an independent basis for DNA testing.

¶ 37 Lastly, Thompson argues that he is entitled to additional DNA testing because the prosecution allowed him to test the blood in the van during his first postconviction proceeding. But the fact that the prosecution previously stipulated to DNA testing of other evidence does not entitle Thompson to whatever additional DNA testing he now seeks.

¶ 38 Because Thompson failed to satisfy the statutory requirements for postconviction DNA testing, the second postconviction court properly denied his DNA testing request.

B. Order Denying Ineffective Assistance Claims

¶ 39 Thompson next contends that the postconviction court erred by denying his ineffective assistance of counsel claims as to both his trial counsel and his first postconviction counsel.

### 1. The Ineffective Assistance Claim Regarding Trial Counsel is Successive

¶ 40    Thompson argues that his trial counsel provided ineffective assistance because he failed to investigate or to provide expert testimony regarding his wrist-laceration theory.

¶ 41    The postconviction court denied this claim because it was successive and thus barred under Crim. P. 35(c)(3)(VII).

¶ 42    We review de novo whether a postconviction claim is successive. *People v. Taylor*, 2018 COA 175, ¶ 8.

¶ 43    Crim. P. 35(c)(3)(VII) requires a court to "deny any claim that could have been presented in an appeal previously brought or postconviction proceeding previously brought." Claims that could have been brought in a previous postconviction motion are barred because they are successive. *Taylor*, ¶ 20.

¶ 44    The postconviction court correctly denied Thompson's claim that trial counsel was ineffective because Thompson could have raised this claim in his first postconviction motion. Thompson's argument that this claim has never previously been litigated fails because it ignores the plain language of Crim. P. 35(c)(3)(VII), which bars claims that "could have been presented" in a previous

postconviction proceeding. And the fact that Thompson argues that his first postconviction counsel was ineffective for not arguing the ineffectiveness of trial counsel in this regard does not automatically revive the claim as to trial counsel.

¶ 45 Undeterred, Thompson argues that his first postconviction counsel's ineffectiveness constituted a justifiable excuse or excusable neglect for not raising the ineffective assistance claim as to trial counsel earlier. But while Crim. P. 35(c)(3)(VII) contains five exceptions to the successiveness bar, justifiable excuse and excusable neglect are not among them. The cases cited by Thompson address the Crim. P. 35(c) motion time bar, which may be tolled by justifiable excuse or excusable neglect. *See, e.g., People v. Chavez-Torres*, 2016 COA 169M, ¶¶ 10–12, *aff'd*, 2019 CO 59. The time bar is not at issue here; therefore, the authorities relied on by Thompson are inapposite.

### 2. The Ineffective Assistance Claims Regarding Postconviction Counsel Fail on the Merits

¶ 46 Thompson next argues that his first postconviction counsel provided ineffective assistance of counsel because she (1) failed to investigate or to procure expert testimony about the wrist-laceration

theory and (2) failed to request additional DNA testing of objects associated with the murder.

¶ 47    As to the first claim, the postconviction court reasoned that Thompson did not establish prejudice because Thompson argued the wrist-laceration theory at trial (albeit not through expert testimony), and the prosecution challenged the legitimacy of the wrist-laceration theory through an expert who called it "junk science."  The court ultimately concluded,

> [T]he Court cannot find that [Thompson] has demonstrated that [expert testimony on the wrist-laceration theory] would have caused a different result.  Judge Stern clearly determined that a new piece of exculpatory evidence was not sufficient to tip the balance in [Thompson's] favor at trial.  It is evident that the addition of evidence with limited value would [not] have overcome the "great reach" he alluded to and change the outcome resulting in a new trial.

¶ 48    As to the second claim, the court concluded that Thompson "didn't present sufficient evidence for the court's consideration that post-conviction counsel erred in not requesting further DNA testing of objects associated with the murder . . . ."

¶ 49    "A claim of ineffective assistance of counsel presents a mixed question of law and fact." *People v. Stovall*, 2012 COA 7M, ¶ 18.

We review de novo the postconviction court's legal conclusions but defer to its factual findings when they are supported by the record. *Id.*

¶ 50 A defendant bears the burden to prove his postconviction claims by a preponderance of the evidence. *People v. Naranjo*, 840 P.2d 319, 325 (Colo. 1992). To prevail on a claim of ineffective assistance, a defendant must show that (1) counsel performed deficiently and (2) prejudice resulted from the deficient performance. *Strickland*, 466 U.S. at 686; *Carmichael v. People*, 206 P.3d 800, 805–06 (Colo. 2009). "[T]he failure to establish one prong of the two-part test defeats a claim for ineffective assistance." *People in Interest of S.L.*, 2017 COA 160, ¶ 60. The *Strickland* standard applies "for evaluating the effectiveness of post-conviction counsel." *Silva v. People*, 156 P.3d 1164, 1169 (Colo. 2007).

¶ 51 To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Dunlap v. People*, 173 P.3d 1054, 1063 (Colo. 2007). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 52    We reject Thompson's argument that the postconviction court applied the wrong standard for evaluating prejudice.  The court correctly noted that Thompson had the burden to prove his postconviction claims by a preponderance of the evidence.  Then, the court correctly applied the reasonable probability standard for determining whether Thompson demonstrated prejudice.  But the court concluded that "the outcome [of the prior proceeding] would not have been different."

¶ 53    Like the postconviction court, we reject both of Thompson's ineffective assistance claims regarding his postconviction counsel because he has not demonstrated prejudice.

¶ 54    Thompson has not demonstrated that expert testimony on the wrist-laceration theory would have changed the result of the first postconviction proceeding.  First, there is evidence in the record supporting the postconviction court's conclusion that the wrist-laceration theory was "evidence with limited value," including the fact that the prosecution's expert called the theory "junk science." Second, as the second postconviction court found (and as the first postconviction court found, and a division of this court determined),

21

there was other strong evidence of Thompson's guilt, including the four witnesses' testimony about Thompson's confessions.

¶ 55 Thompson also failed to demonstrate that the result of the prior proceeding would have been different had counsel requested additional DNA testing.[7] Such an argument is inherently speculative because the testing has not been performed. "When the evidence only provides speculative proof of prejudice," a defendant's ineffective assistance claim fails. *People v. Finney*, 2012 COA 38, ¶ 66, *aff'd*, 2014 CO 38.

### III. Conclusion

¶ 56 The orders are affirmed.

JUDGE FURMAN and JUDGE GROVE concur.

---

[7] The Attorney General contends that Thompson's claim regarding DNA testing fails because he did not present any evidence about it at the hearing. This appears to be the basis on which the trial court denied the claim, as it reasoned that Thompson "didn't present sufficient evidence for the court's consideration . . . ." But the prosecutor at the Crim. P. 35(c) hearing stipulated that Thompson's expert's testimony and affidavit from the hearing on DNA testing could be incorporated into the record of the Crim. P. 35(c) hearing, and that the testimony and affidavit addressed this argument. That being the case, we resolve this argument on Thompson's deficient evidence of prejudice. We may affirm a district court's judgment on any ground supported by the record, even if the district court did not raise or address that ground. *People v. Scott*, 116 P.3d 1231, 1233 (Colo. App. 2004).