24CA0169 Peo v Hebert 07-17-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0169
City and County of Denver District Court No. 01CR2554
Honorable Alex C. Myers, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Hal Lewis Hebert,

Defendant-Appellant.

---

ORDER AFFIRMED

Division VII
Opinion by JUDGE PAWAR
Lipinsky and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 17, 2025

---

Philip J. Weiser, Attorney General, Paul Koehler, Senior Counsel, Denver, Colorado, for Plaintiff-Appellee

Hal Lewis Hebert, Pro Se

¶ 1    Defendant, Hal Lewis Hebert, appeals the postconviction court's order denying his motion to conduct postconviction DNA testing. We affirm.

## I.    Background

¶ 2    The relevant facts are set forth in the division's opinion affirming Hebert's judgment of conviction on direct appeal, *People v. Hebert*, (Colo. App. No. 03CA1471, Feb. 15, 2007) (not published pursuant to C.A.R. 35(f)) (*Hebert I*).

> On the evening of April 11, 2001, a white Toyota Camry was observed parked, engine running, in a northeast Denver neighborhood. When local residents noticed the car was still running in the same place late the following afternoon, they investigated, discovered the victim's body in the trunk, and called the police.
>
> The police ran a motor vehicle report and learned that the car was registered to Carol Hebert. According to motor vehicle records, Carol Hebert was five feet four inches tall, weighed 120 pounds, and had brown hair and brown eyes — a description matching the victim.
>
> The victim's body was bloody, and it appeared that she had been killed by a single gunshot to the back of the head. Based on the body's position in the trunk, the police determined that she had been killed somewhere else.

Officers went to the Hebert residence and conducted a warrantless search. They discovered very small blood droplets in various areas, including the carport, the sidewalk to the garage, the hardwood floor, and on a pair of men's shoes. The officers did not touch anything, but covered the suspected blood droplets on the patio with plastic.

Using information obtained from the initial search, the police obtained a search warrant. From the subsequent search, it appeared that the victim had been shot while sitting in a chair in the office and her body had been carried or dragged through the home into the attached garage. An officer testified that it looked like someone had tried to clean up the blood in the house.

Bullet fragments recovered from the victim were from a .22 or possibly a .38 caliber gun. Although the fragments did not match weapons found in the Heberts' home, twenty-eight .22 caliber shell casings fired from the same unknown gun were found in a shooting range in the Heberts' basement.

*Id.* at 1-2.

¶ 3     Hebert's neighbors reported to police officers that they had seen him back his wife Carol's car into the garage the day before her body was found. *Id.* at 5-7. The neighbors remarked that this was unusual because Hebert did not drive her car and never backed cars into the garage. *Id.*

2

¶ 4     At trial, a bail bondsman testified that Hebert told him that he "didn't mean to intentionally kill" his wife.  *Id.* at 13.

¶ 5     Another witness, with whom Hebert had an affair, testified that she received a letter from Hebert after his arrest, in which he said that she knew "how he felt about Carol, and he was . . . trying to make clear that he would never hurt a woman, he would never hurt Carol, he would never intentionally hurt Carol."  *Id.* at 22. Hebert also said in the letter that "there was an accident, a terribly grievous accident, Carol was hurt badly and she died."  *Id.*  The witness testified that the letter had scared her, so she burned it.  *Id.* at 22-23.

¶ 6     Linda Davis testified that Hebert gave her husband a book "where somebody had been killed, [and] the two guys who did the killing said, 'Let's just put the body in the trunk and leave the car in a bad neighborhood.'"  *Id.* at 16.  Davis also testified

> that her husband sold a handgun to [Hebert]. [Richard White], the person who sold the gun to [Davis's] husband, testified that the gun he sold was either a .22 caliber Beretta or a .410 caliber Cobray.  The prosecution used this testimony to support its theory that [Hebert] purchased a .22 caliber gun, which was the same caliber as the murder weapon.

*People v. Hebert*, slip op. at 4-5 (Colo. App. No. 09CA1423, March 10, 2011) (not published pursuant to C.A.R. 35(f)) (*Hebert II*).

¶ 7      A jury convicted Hebert of first degree murder, and the trial court sentenced him to life without parole in the custody of the Department of Corrections. Hebert directly appealed his conviction and, as noted above, a division of this court affirmed. *See Hebert I.* The mandate was issued on November 15, 2007.

¶ 8      Hebert filed several unsuccessful postconviction motions and appeals between 2008 and 2019. *See Hebert II*; *People v. Hebert*, (Colo. App. No. 14CA2307, Aug. 18, 2016) (not published pursuant to C.A.R. 35(e)) (*Hebert III*); *People v. Hebert*, (Colo. App. No. 21CA0120, Oct. 6, 2022) (not published pursuant to C.A.R. 35(e)) (*Hebert IV*).

¶ 9      In 2023, Hebert filed the postconviction motion at issue. He requested postconviction DNA testing pursuant to sections 18-1-411, C.R.S. 2024, 18-1-412, C.R.S. 2024, and 18-1-416, C.R.S. 2024. Specifically, he claimed that the gun he purchased from Davis's husband was a 9mm Makarov, which he alleged Davis's husband had purchased from White. Hebert claimed that White lied on the witness stand when he said he sold either a .22

caliber Beretta or a .410 caliber Cobray to Davis's husband. Hebert requested DNA testing on the Makarov, which he alleged was in police custody, claiming it would reveal White's DNA, undermine White's testimony, and "erase any inference of premeditation," thereby requiring reversal of his "false conviction." Hebert further asserted that the prosecution engaged in misconduct and violated *Brady v. Maryland*, 373 U.S. 83 (1963).

¶ 10 The postconviction court denied Hebert's motion, finding there was "no reasonable probability that the testing [Hebert] seeks would yield a favorable result." The court relied on the "plethora of evidence" presented against Hebert, "irrespective of the gun he purchased from [Davis's husband]," including

> (1) blood linked to the victim was found on [Hebert's] shoes; (2) a neighbor saw [Hebert] backing the victim's car into their garage on the day of the murder; (3) many .22 shell casings were found in a makeshift shooting range in the basement of the couple's home; (4) [Hebert] wrote a letter in which he stated that his wife had died in a terrible accident; (5) [Hebert] told a bondsman that he would never kill his wife intentionally; (6) [Hebert] delivered a book to [Davis's husband] sometime before the murder which contained discussion from two characters about committing a murder, placing the body into the trunk of the victim's car, and leaving it in a "bad" neighborhood.

¶ 11    The court further found that

> the record shows that [White's] testimony about the sale of the gun was in direct conflict with that of [Davis], who was present when [Hebert] purchased the gun from [her husband].  While [White] stated that he sold [the husband] a .22 Beretta without double stamping, [Davis] stated that the gun [her husband] sold [Hebert] was double stamped and had not been a Beretta.  Additionally, testimony revealed that [Davis's husband] had been relieved upon finding out the caliber of gun that had been used in the crime, allowing the jury to infer that it was not the gun he had sold to [Hebert].

The court concluded that "the record at trial already reveals ample evidence from which the jury could have inferred that the gun sold by [White] and [Davis's husband], which eventually ended up in the possession of [Hebert], was not a .22 caliber gun."

¶ 12    The postconviction court did not address Hebert's prosecutorial misconduct or *Brady* violation claims.

## II.    Discussion

¶ 13    On appeal, Hebert contends that the postconviction court erred by denying his motion for postconviction DNA testing.  We are not persuaded.

## A. Applicable Law and Standard of Review

¶ 14    Sections 18-1-411 to -416 govern an incarcerated person's postconviction motion for DNA testing.  Under section 18-1-412(2), a motion for such testing "shall include specific facts sufficient to support a prima facie showing that post-conviction relief is warranted under the criteria set forth in section 18-1-413, [C.R.S. 2024]."  Under section 18-1-413(1), a court "shall order DNA testing if:"

> (a) It finds a reasonable probability that the petitioner would not have been convicted if favorable results had been obtained through DNA testing at the time of the original prosecution;
>
> (b) It finds by a preponderance of the evidence that a law enforcement agency collected biological evidence pertaining to the offense;
>
> (c)
>
> > (I) It finds by a preponderance of the evidence that DNA results were not available prior to the petitioner's conviction or, if previously available and tested, the evidence can be subjected to more advanced, scientifically reliable DNA testing that provides a reasonable likelihood of more probative results; or
> >
> > (II) The petitioner did not secure the requested DNA testing prior to the petitioner's conviction because DNA

> testing was not reasonably available or for reasons that constitute justifiable excuse, ineffective assistance of counsel, or excusable neglect; and
>
> (d) The petitioner consents to provide a biological sample for DNA testing.

"If the motion, files, and record of the case show to the satisfaction of the court that the petitioner is not entitled to relief based on the criteria specified in section 18-1-413, the court shall deny the motion without a hearing and without appointment of counsel." § 18-1-412(3).

¶ 15    A postconviction court's ruling on a motion for postconviction DNA testing presents a mixed question of fact and law. *People v. Thompson*, 2020 COA 117, ¶ 24. We review the court's factual findings for clear error and its legal conclusions de novo. *Id.* Under the clear error standard, an appellate court may disregard a postconviction court's findings of fact only if the record is "devoid" of support for them. *People v. West*, 2019 CO 131, ¶ 7.

### B. Additional Testing Would Not Establish a Reasonable Probability that Hebert Would Not Have Been Convicted

¶ 16    As an initial matter, we are unable to review the trial transcripts because they were not included in the appellate record.

8

Although Hebert asks us to take judicial notice of the transcripts from his direct appeal, "[i]t is the appellant's responsibility to designate the record on appeal, including those parts of the trial proceedings that are necessary for purposes of the appeal . . . ." *People v. Duran*, 2015 COA 141, ¶ 12. "If an appellant intends to urge on appeal that a finding or conclusion is unsupported by or contrary to the evidence, the appellant must include in the record a transcript of all evidence relevant to such finding or conclusion." *Id.* Though Hebert disputes the postconviction court's factual findings and legal conclusions on appeal, in the absence of the transcripts, we presume that they support the court's ruling. *See id.*

¶ 17 Moreover, we conclude that Hebert failed to adequately plead in his motion that favorable DNA testing would demonstrate a reasonable probability that he would not have been convicted. *See* § 18-1-413(1)(a). Although he speculates that DNA testing would establish the presence of White's DNA on the Makarov and the inference that he bought the Makarov, not a .22, from Davis's husband, such a showing would not negate the ample evidence of Hebert's guilt. We agree with the People that, at most, such DNA

9

evidence would undermine the credibility of White on a peripheral issue.

¶ 18    The evidence against Hebert included the following: (1) his wife's blood was found on the carport, the sidewalk to the garage, the hardwood floor, and Hebert's shoes; (2) a neighbor witnessed Hebert backing his wife's car into the garage on the day of the murder, which was unusual; (3) Hebert told a bail bondsman that he "didn't mean to intentionally kill" his wife; (4) Hebert gave Davis's husband a book in which the body of someone who was killed was placed in the trunk of a car and left in a "bad neighborhood"; (5) Hebert wrote a letter to a witness saying that there had been "a terribly grievous accident, Carol was hurt badly and she died"; and (6) shell casings from the gun used to kill Hebert's wife were found in a shooting range in the basement of Hebert's home.  Furthermore, as the postconviction court found, and as we must presume is supported by the missing trial transcripts, the record includes testimony from Davis from which the jury could have inferred that the gun her husband bought from White and sold to Hebert was not a .22 caliber gun.

¶ 19    Because (1) the DNA results Hebert hoped to find on the Makarov would not have negated the evidence against him and (2) there was already evidence from which a jury could infer that Hebert did not purchase a .22 caliber gun from Davis's husband, favorable DNA results would not have demonstrated a reasonable probability that Hebert would not have been convicted.

## C.    Additional Claims

¶ 20    To the extent Hebert reasserts his prosecutorial misconduct and *Brady* violation claims on appeal, those claims are cognizable under Crim. P. 35(c) and are properly denied as successive.  *See People v. Collier*, 151 P.3d 668, 670 (Colo. App. 2006) (the substance of a postconviction claim controls how it is designated); Crim. P. 35(c)(2)(I) (providing for relief where a conviction was obtained or sentence imposed in violation of the Constitution or laws of the United States or the constitution or laws of this state). The claims are successive because Hebert could have raised them in a prior postconviction motion and did not argue any exception to this rule.  *See* Crim. P. 35(c)(3)(VII) (a court must deny any claims as successive that could have been raised in a prior appeal or

postconviction proceeding, subject to certain exceptions not relevant here).

¶ 21 And to the extent Hebert asserts new claims on appeal that he did not raise in his postconviction motion — such as a due process challenge to the blood spatter evidence — we will not review them. *See People v. Cali*, 2020 CO 20, ¶ 34 ("[A]lthough we will broadly construe a pro se litigant's pleadings to effectuate the substance, rather than the form, of those pleadings, we will not consider issues not raised before the district court in a motion for postconviction relief.").

¶ 22 Finally, Hebert raises issues for the first time in his reply brief. For instance, he claims that a court should

> also take into consideration evidence that was discovered after trial which reveals perjury, fabricated evidence and other flaws with the evidence that was introduced at trial when determining if there is a reasonable probability that a defendant would not have been found guilty at trial.

But we do not consider claims raised for the first time in a reply brief. *People v. Owens*, 2024 CO 10, ¶ 90.

### III. Disposition

¶ 23 The order is affirmed.

12

JUDGE LIPINSKY and JUDGE LUM concur.