21CA1200 Peo v Wuthrich 05-29-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA1200
Adams County District Court No. 07CR687
Honorable Priscilla J. Loew, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Todd Wuthrich,

Defendant-Appellant.

ORDER AFFIRMED

Division II
Opinion by JUDGE FOX
Harris and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 29, 2025

Philip J. Weiser, Attorney General, Brenna A. Brackett, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith K. Rose, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, Todd Wuthrich, appeals the postconviction court's order rejecting his Crim. P. 35(c) petition requesting a new trial on charges that he sexually assaulted his then-four-year-old daughter, L.W., and his four-year-old nieces, M.C. and C.C.  He claims his trial counsel provided unconstitutionally ineffective assistance.  We affirm the postconviction court's order.

## I.      Background

¶ 2      In 2006, D.C., L.W.'s mother, separated from Wuthrich after learning he lied about a court date relating to charges for soliciting a minor; Wuthrich eventually pleaded guilty to solicitation of an adult prostitute.  The police report indicated that Wuthrich "had asked a child to perform oral sex."

¶ 3      D.C. told M.C.'s mother about these events, and M.C.'s mother recalled that six months earlier M.C. told her, during a "safety talk," that L.W. had touched and "licked" her privates in a "puppy and kid game."  M.C.'s mother also shared M.C.'s disclosures with C.C.'s mother.  C.C.'s mother then had safety talks with C.C., and C.C. also disclosed that L.W. had touched her privates.

¶ 4      D.C. called the police, and all three children later disclosed that Wuthrich had touched them inappropriately.  After L.W. and

1

M.C. began therapy, in January 2007 L.W. disclosed to her therapist, Susan Giragosian, that Wuthrich had touched her "private parts." C.C. later disclosed to her parents that Wuthrich had touched her privates with his hands. C.C. began therapy after a forensic interview. C.C. also later disclosed that Wuthrich's "private part touched her private part." Finally, M.C. disclosed in therapy, and in a September 2007 forensic interview, that Wuthrich had touched her inappropriately. At trial — in December 2007 — all three victims testified that Wuthrich had touched them inappropriately, but each of them also recanted on cross-examination.

¶ 5    The defense's theory at trial was that the children had not been assaulted and that the allegations resulted from suggestions made by the children's parents. The defense argued the parents pushed the children to make allegations against Wuthrich and influenced the children to remember events that never occurred because the parents could accept no other explanation for the children's behavior after learning about Wuthrich's solicitation case and because D.C. had an "agenda." As support for its theory, the defense pointed to the long timeframe between the discovery of the

inappropriate touching and the later allegations against Wuthrich, despite many therapy sessions and interviews in the interim where the children denied that Wuthrich had touched them.  The defense also argued the allegations resulted from invasive sexual assault examinations that traumatized the children.

¶ 6      The jury convicted Wuthrich for sexually assaulting all three young victims in 2007.  He was convicted on nine counts: three counts of sexual assault on a child under the age of fifteen by one in a position of trust (one for each victim); two counts of sexual assault on a child by one in a position of trust — pattern of abuse; three counts of sexual assault on a child; and one count of aggravated incest.  The separate charges for acts against each victim merged, and Wuthrich received three concurrent sentences of fifteen years to life in the custody of the Colorado Department of Corrections plus one concurrent sentence of ten years to life with lifetime parole for the aggravated incest charge.

¶ 7      Wuthrich filed a direct appeal, and a division of this court affirmed his convictions in 2011.  *See People v. Wuthrich*, (Colo. App. No. 08CA0972, Feb. 17, 2011) (not published pursuant to C.A.R. 35(f)).  Wuthrich later sought a sentence reduction pursuant

to Crim. P. 35(b), which the postconviction court denied without a hearing in April 2012.

¶ 8        Wuthrich then timely moved for postconviction relief under Crim. P. 35(c) in November 2012.  *See People v. Metcalf*, 979 P.2d 581, 583 (Colo. App. 1999) ("[T]he date of conviction for purposes of [section] 16-5-402[, C.R.S. 1998,] is the date the appeal is exhausted . . . ."); *see also* § 16-5-402(1), C.R.S. 2024.  Wuthrich's Rule 35(c) petition raised numerous claims across hundreds of pages but primarily challenged the effectiveness of his trial counsel, Rowe Stayton.  After multiple delays and continuances, a defense expert, Eric Klein, "crystalized" the issues in Wuthrich's petition into sixteen claims in February 2019.  Of these sixteen reframed claims, the postconviction court found, in March 2020, that some (part of claim five and claim fourteen)[1] did not merit a hearing, but it reviewed the remaining claims.  The reframing of Wuthrich's claims and the exclusion of some are uncontested on appeal.

---

[1] Part of claim five focused on the fee structure Stayton used to bill Wuthrich as part of a claim that Stayton did not sufficiently prepare for trial.  The fee structure is mentioned in Wuthrich's opening brief as part of the facts, but it is not part of an argument on appeal. Claim fourteen related to contentions that Stayton called witnesses who hurt the defense's case, including Wuthrich's brother.

¶ 9    The postconviction court held a four-day hearing in June 2021. Stayton testified that he "made mistakes or unsound strategy decisions that contributed to a false conviction," his representation of Wuthrich was ineffective, and Wuthrich should receive a new trial. Even so, the postconviction court rejected all of Wuthrich's ineffective counsel claims and denied his petition.

¶ 10    The court heard testimony on all of the crystallized claims, which form the basis for Wuthrich's nine claims on appeal. On appeal Wuthrich combined some of the reframed claims into categories, such as claims based on alleged failures to present exculpatory evidence. For clarity we largely adhere to this framing. Wuthrich's appeal does not challenge some of the postconviction court's findings, including its rejection of claims related to alleged failures to object to a detective's testimony and to call Wuthrich to testify in his own defense, so those are abandoned. *See People v. Osorio*, 170 P.3d 796, 801 (Colo. App. 2007).

## II.    Standard of Review and Applicable Law

¶ 11    "A claim of ineffective assistance of counsel presents a mixed question of law and fact." *People v. Stovall*, 2012 COA 7M, ¶ 18. "We review de novo the postconviction court's legal conclusions but

defer to its factual findings when they are supported by the record." *People v. Thompson*, 2020 COA 117, ¶ 49.

¶ 12     "To prevail on a claim of ineffective assistance of counsel under Rule 35(c), a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced him." *People v. Sharp*, 2019 COA 133, ¶ 11 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)).  A defendant's ineffective assistance of counsel claim will fail, and a court need not address both prongs, "if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

¶ 13     For the "performance" prong, the "inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688.  In reviewing counsel's performance, "[j]udicial scrutiny . . . must be highly deferential" as "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  Thus, "[b]ecause of the difficulties inherent in making the

evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Under this deferential standard, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690.

¶ 14     As for the "prejudice" prong, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. . . . [A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 691-92. Therefore, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. And "[i]n making this determination, a court . . . must consider the totality of the evidence before the judge or jury," as some errors may be more prejudicial than others. *Id.* at 695-96. For example, "a verdict or conclusion only weakly supported by the record is more

likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

### III. Postconviction Claims Appealed

#### A. Night Terrors

¶ 15  First, Wuthrich argues that Stayton was ineffective because he failed to object to the admission of a video of L.W.'s "night terrors" that D.C. had recorded. Additionally, he argues that Stayton was ineffective because — after L.W.'s therapist characterized the night terrors as a "symptom" of abuse — Stayton failed to research night terrors and challenge or rebut the testimony with a defense expert.

#### 1. Trial Testimony

¶ 16  The challenged video was introduced during D.C.'s direct examination, where she described L.W.'s trouble with "night terrors" and L.W.'s behavior with her cousins as the impetus for starting L.W. in therapy. She described the night terrors as an "ongoing problem" that occurred "several nights a week" for a "very long time" and stated that the night terrors occurred before she and Wuthrich separated and before L.W. started therapy. D.C. also testified that L.W. "almost always" did not remember the incidents. The prosecution introduced a recording of an episode of night terrors

from April 2007. Stayton stipulated to the video's admissibility, and it was shown to the jury.

¶ 17 On cross-examination Stayton asked why, if the night terrors had occurred before the separation, D.C. had never told L.W.'s pediatrician about them. Stayton also inquired about a sexual assault examination L.W. underwent and the "positions" L.W. was placed in for the exam, highlighting that D.C. also did not tell the examiners about L.W.'s night terrors.

¶ 18 Next, Giragosian — an expert "therapist in victimization and trauma issues" — testified that L.W. was referred to her and that D.C. described various "symptoms." These "symptoms" included that L.W. was "sexually acting out quite a bit in sexual play," she was "secretive" about the sexual play, she had "temper tantrums," and she experienced night terrors. Although Giragosian repeatedly referred to these behaviors as "symptoms," she did not specifically say that these were symptoms of a specific trauma. She also stated that her role as a therapist was to "assist[] [L.W.] with her symptoms."

¶ 19 In closing arguments the prosecution mentioned the night terrors when thanking the jury for its dedication in a difficult case,

stating, "certainly watching that video of the night terrors couldn't have been pleasant." The prosecution also stated that part of Giragosian's job was to "figure out why this little girl wakes up every night screaming[,] . . . not remembering what happened."

¶ 20 Stayton also referenced the video in closing arguments, noting that it was unusual that "[i]f your daughter is going through night terrors, the first thing in your mind is, I want to prove this thing in court." Stayton reiterated the defense's theory that the examinations "traumatized" L.W., which caused the night terrors.

2. Postconviction Testimony and Findings

¶ 21 Stayton testified at the postconviction hearing that, based on his experience, he believed the video would "probably be admitted." His strategy at trial was to allow the video to be played and concede that L.W.'s night terrors were the result of trauma but to argue that the trauma was, instead, connected to a sexual assault examination. He conceded that "I felt we had an explanation for it. In retrospect we didn't." Stayton also testified that he used the video to cross-examine D.C. about the night terrors and why she had not disclosed them to L.W.'s pediatrician.

¶ 22    The postconviction court found that the video was introduced, without objection, to explain why L.W. was in therapy. The court also noted that Stayton elicited testimony from D.C. that she never told L.W.'s pediatrician about the night terrors to challenge her credibility. The court noted that Stayton elicited testimony on cross-examination from Giragosian to support the defense's theory.

¶ 23    The court also discussed the postconviction hearing testimony provided by Dr. Pinar Polat, a defense expert in "child sleep medicine and neurology." Polat testified that the exact cause of night terrors is unknown, though they can be triggered by "sleep deprivation, certain medications, . . . sleep apnea, anxiety, stress, [or] excitement," but it "doesn't have to be negative stress," and that "[e]ssentially anything that would wake someone up [could] trigger a sleep terror."

¶ 24    Polat also testified that the frequency of night terrors could increase during times of stress, but stress would be an "indirect" cause of night terrors. Polat added that there is no direct link between trauma and terrors, and that night terrors are not a direct symptom of sexual assault. On cross-examination Polat also testified, however, that trauma could be a contributing factor and

11

that other "sleep disturbances" like insomnia (which can be associated with trauma) could be linked to night terrors because of the resulting sleep deprivation.

¶ 25      The postconviction court found that Stayton was not ineffective by not objecting to the video's admission or calling an expert at trial to discuss night terrors. The court noted that the video was introduced to suggest that the night terrors were "a manifestation of something going on with L.W." and that it "could not find one quote in the transcript where someone said that [the terrors were] the result of sexual trauma." The court found that it was the jury's role to determine what weight to give the video evidence and that Stayton made a strategic decision to "address [the child's] positioning in that video" during trial. The court added that when "look[ing] at the totality of the evidence before the jury" — particularly that there were two other victims — the night terror video claim did not meet *Strickland*'s requirements, and it thus rejected Wuthrich's claim.

### 3.    Analysis

¶ 26      Wuthrich now argues that a causal connection between night terrors and sexual abuse is unsupported by scientific evidence and,

therefore, Stayton was deficient for failing to challenge the video's admission. Wuthrich argues he should have been granted a new trial because there was a reasonable probability of a different outcome without these errors. Wuthrich also argues that the postconviction court misconstrued the law when it found that Stayton made a strategic decision to argue that L.W.'s positioning in the video was connected to the sexual assault exam.

¶ 27 We agree with the postconviction court that Stayton's performance was reasonable. *See Strickland*, 466 U.S. at 688-89. The night terrors video explained why D.C. put L.W. in therapy and could support Stayton's theory that the night terrors resulted from the sexual assault examination. *See* CRE 401. While the video was described as hard to watch, it was not unfairly prejudicial given its relevance to the prosecution's and the defense's theories. *See* CRE 403.

¶ 28 Stayton testified that he "was aware of what night terrors" were at the time of trial and that they differed from nightmares. Stayton anticipated the video would be admitted and opted to argue there was an alternative explanation for L.W.'s night terrors. Stayton made this decision in light of his experience — having

handled "hundreds" of cases over thirty years and tried "probably . . . 30" cases involving sexual assault against children. *See People v. Newmiller*, 2014 COA 84, ¶ 60 (reviewing courts are even more reluctant to challenge the presumption of reasonable performance when counsel is experienced with criminal trials).

¶ 29 Further, during cross-examination Stayton effectively questioned D.C. about (1) when L.W. began experiencing night terrors; (2) why she chose to film them; and (3) her failure to tell L.W.'s pediatrician about them. Stayton also connected L.W.'s positioning in the video to the sexual assault examination. As experienced counsel, Stayton did not need to do additional research or call a defense expert to make these points. *See id.* ("[T]rial counsel need not introduce expert testimony on his [or her] client's behalf if he [or she] is able effectively to cross-examine prosecution witnesses and elicit helpful testimony." (quoting *Reinert v. Larkins*, 379 F.3d 76, 95 (3d Cir. 2004))) (alterations in original). The jury ultimately had to decide the significance of the night terrors. *See People v. Randolph*, 2023 COA 7, ¶ 33 (the jury weighs the credibility of witnesses and resolves conflicting testimony) (*cert. granted* Sept. 25, 2023).

¶ 30    Further, even if we were to assume that Stayton was ineffective for failing to research night terrors or call a defense expert to challenge this testimony, Polat's postconviction testimony shows that Wuthrich suffered no prejudice because there is no reasonable probability the result would have been different. *See Strickland*, 466 U.S. at 694. Polat established that there is no direct link between night terrors and sexual abuse, but she acknowledged that they could be triggered by stress, trauma, or insomnia, which could in turn be related to traumatic issues like sexual abuse. The night terrors were triggered by something, but their cause was unclear. The prosecution argued the night terrors were linked to the abuse. Stayton argued the night terrors were linked to the sexual assault examination.

¶ 31    Because Polat could not diagnose the cause of L.W.'s night terrors, and indeed she could not rule out trauma related to sexual abuse, her testimony did not definitively rebut the prosecution's theory. Therefore, counsel's failure to introduce the testimony was not prejudicial to Wuthrich's defense. *See People v. Chipman*, 2015 COA 142, ¶¶ 47-51 (no prejudice from counsel's failure to retain an expert to test blood on the defendant's clothing where expert's

15

findings would not have substantially supported the defendant's theory of defense).

¶ 32     Finally, as the postconviction court noted, the night terrors video was not the only evidence provided to the jury.  We must consider the impact of the video in light of the totality of the evidence at trial, including the testimony of the children, mothers, and experts.  *See Strickland*, 466 U.S. at 689, 695-96.

¶ 33     Considering the night terrors video with the trial evidence and the strong presumption of reasonableness afforded to counsel's performance, without the distortion of hindsight, Stayton was not ineffective.  *See id.* at 689.  And Wuthrich was not prejudiced regardless.  *See id.* at 689, 695-96.  The postconviction court did not err.

## B.     Solicitation Case

¶ 34     Next, Wuthrich argues that Stayton was ineffective because he failed to challenge the admission of evidence concerning Wuthrich's solicitation case, or to place the charges in a proper factual context.

### 1.     Testimony at Trial

¶ 35     The prosecution filed a pretrial notice of intent to introduce evidence about the solicitation case through CRE 404(b) and res

gestae.[2]  Stayton objected, arguing the evidence was improper character evidence, overly prejudicial, and irrelevant.  The court admitted the evidence.

¶ 36     The solicitation case and an alleged "child prostitute" were first mentioned during Stayton's opening statements.  D.C. then testified on direct that Wuthrich was "arrested for soliciting a child prostitute," she later learned that Wuthrich lied about a court date related to these charges, and he "had asked a child to perform oral sex."  D.C. testified this was why she separated from Wuthrich.

¶ 37     Stayton objected to this testimony because it was "outside of the 404(b)" notice, and the trial court initially sustained the objection; but, after the court reviewed the notice, it permitted the testimony.  Stayton later renewed this objection outside the jury's presence and argued the prosecution agreed to only discuss that Wuthrich "was charged with [soliciting a minor] and the age, 15."  The court overruled the objection and declined to offer a limiting instruction because it admitted the evidence as res gestae.

---

[2] The Colorado Supreme Court abolished the res gestae doctrine in *Rojas v. People*, 2022 CO 8, ¶ 41.

¶ 38   On cross-examination Stayton asked D.C. to describe how she learned about "the solicitation of a prostitute, a child prostitute." D.C. testified that she knew Wuthrich denied soliciting a child, he contended that he solicited an adult, and Wuthrich pleaded guilty to solicitation of an adult prostitute. Stayton also asked D.C. if "soliciting this 15 year old" made her think that Wuthrich may have sexually abused L.W. Stayton repeatedly referred to the solicited individual as "a child." Wuthrich's brother also testified about the charges and told the jury that "the final charge was attempt to solicit a prostitute," not a child prostitute.

¶ 39   Stayton's closing argued that the prosecution was trying to draw an analogy "between a 15-year-old and [Wuthrich's] own daughter." According to Stayton, this did not make sense because "rather than perpetrate on his kids, [Wuthrich] can get sexual [gratification from] a prostitute" and "going to a prostitute does not make people child molester[s]."

2.    Postconviction Testimony and Findings

¶ 40   Stayton testified that he believed the solicitation case evidence was going to be admitted at trial and used it to argue that it explained why the victims' parents sent them to therapy. Stayton

18

also testified that he wanted to reference the charge first to avoid any surprises during cross-examination and that Wuthrich agreed to this strategy.

¶ 41 The postconviction court found that the defense was "in a position where this highly prejudicial evidence was coming into court, and they had to address it in some way. They decided to address it . . . by acknowledging it . . . ." The court also noted that Stayton used the words "child prostitute" more than anyone else (aside from D.C.). The court found that Stayton was not ineffective for directly addressing the charges, but it was deficient to characterize the individual as a "child prostitute" without a full explanation.

¶ 42 Yet the court found that while Stayton's performance was unreasonable in this regard, the deficiency had not prejudiced Wuthrich to the degree that a new trial was warranted. The court noted that Stayton effectively cross-examined D.C. about her potential bias and her state of mind after learning about the charges. Further, the court found that the jury had a "complete picture" of the solicitation case. As a result, the postconviction court rejected the claim.

### 3.    Analysis

¶ 43    According to Wuthrich, Stayton failed to challenge the evidence of the solicitation case.  Instead, Stayton conceded that Wuthrich solicited a "teenage prostitute," repeatedly emphasizing this.  And in closing, Wuthrich contends that Stayton "awkwardly" argued that Wuthrich would not have committed the sexual assault against the victims because a fifteen-year-old and the child victims were inapposite.  Wuthrich argues that Stayton's performance was therefore deficient, and he should have (1) objected to the admission of the evidence; (2) minimized the damage associated with its admission by requesting a limiting instruction; and (3) stressed that Wuthrich never solicited a minor.

¶ 44    Wuthrich argues he was harmed by Stayton's deficient performance because the jury "drew negative inferences" about him when it learned he solicited a prostitute.  Wuthrich contends the postconviction court misconstrued the law by failing to consider how the outcome of trial might have differed absent Stayton's ineffectiveness.

¶ 45    We agree with the postconviction court that Stayton reasonably discussed the solicitation case to avoid any later

20

surprise, particularly as he knew it was going to be admitted through CRE 404(b).  *See Strickland*, 466 U.S. at 688-89.  Indeed, the record belies Wuthrich's contention that Stayton failed to object to the admission of this testimony; he objected before and during trial but was overruled, and the court rejected a limiting instruction.

¶ 46    We also agree with the postconviction court that Wuthrich was not prejudiced.  Assuming without deciding that Stayton's performance was unreasonable in some respects, in the face of prejudicial evidence Stayton knew would be admitted, he attempted to use the evidence to support Wuthrich's theory of the case.  *See Sharp*, ¶ 11; *Strickland*, 466 U.S. at 697-98.  Further, the jury received all of the information about the solicitation case needed to make an informed decision.

¶ 47    Stayton's theory at trial was that the solicitation case motivated Wuthrich's divorce and ultimately led to the sexual assault allegations against him.  Stayton also argued that soliciting an adult prostitute does not equate to assaulting children.  And Stayton suggested that the solicitation case led D.C. to accuse Wuthrich of assaulting L.W.  Further, he elicited testimony

demonstrating that Wuthrich believed he solicited an adult prostitute, the charges for soliciting a minor were dropped, and he pleaded guilty to solicitating an adult.

¶ 48 As a result, any prejudice that may have resulted from Stayton's repeated reference to a child prostitute did not prejudice Wuthrich because there is no reasonable probability that, but for these mentions, the result of Wuthrich's trial would have differed. *See Strickland*, 466 U.S. at 694.

### C. Prosecution Experts

¶ 49 Next, Wuthrich argues that Stayton was ineffective for failing to investigate and challenge some of the prosecution's expert witnesses, request their reports, or interview them. Specifically, Wuthrich argues that two witnesses, Giragosian and Terri James-Banks, were admitted as experts, but Stayton failed to challenge or prepare for their testimony.

### 1. Postconviction Testimony and Findings

¶ 50 At the postconviction hearing Stayton testified that he could not recall if he interviewed these experts or if he requested their reports, though it was his practice to interview experts. On cross-examination he stated that, based on his experience, most expert

witnesses the prosecution sought to admit were qualified to testify as experts.[3]

¶ 51    The postconviction court found that Stayton adequately prepared for the prosecution's experts, particularly given that he was familiar with some of the experts and had prior experience with similar cases.  The court added that while Stayton could have done additional diligence, he effectively cross-examined Giragosian and James-Banks to highlight the defense's theory of the case.  And it noted that after the children recanted on the stand, Stayton and his co-counsel, Jennifer Henslee, "felt like everything went . . . the best way it could have gone" and that "every indication was that it was going well."  Therefore, the postconviction court concluded, Stayton's decision not to call additional defense expert witnesses or do more with the prosecution's witnesses was reasonable.

## 2.    Analysis

¶ 52    Wuthrich argues that Stayton failed to object to Giragosian's and James-Banks' testimony where that testimony was

---

[3] In a motions hearing on September 21, 2007, the prosecution represented it would provide the defense with an expert report for James-Banks if she prepared one by November 2; it is unclear if she prepared a report and if this was given to the defense.

unsupported by scientific evidence.  Wuthrich also contends the postconviction court misconstrued the law by finding that Stayton's cross-examination of the experts was sufficient without considering whether the decision to forgo investigating the experts before trial was deficient.

¶ 53    Wuthrich contends he was harmed by these deficiencies because the expert testimony was "critical in shoring up" the prosecution's case by explaining the victims' denials and recantations of the abuse.  He argues this evidence was especially harmful because the case turned on the victims' credibility and the jury could have deferred to the expert testimony.

¶ 54    Wuthrich specifically highlights James-Banks' testimony concerning children who deny that abuse occurred and recant allegations of abuse, arguing that Stayton should have challenged her testimony as scientifically unsupported.  Wuthrich points to her testimony that around "85 percent" of children initially deny that abuse occurred, and that children's abuse disclosures and outcries are a "process."

¶ 55    Wuthrich highlights a 2005 study he argues contradicts James-Banks' testimony: Kamala London et al., *Disclosure of Child*

*Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, 11 Psych. Pub. Pol'y & L. 194, 217 (2005) (A meta-analysis of multiple studies about child sexual abuse and children's disclosures concluded that "most children do disclose abuse within the first or second" formal investigative interview and "[o]nly a small minority of these children recant their abuse reports."). Wuthrich also points out that the New Jersey Supreme Court held — in 2018 (citing the same study and updated reports) — that evidence concerning "Child Sexual Abuse Accommodation Syndrome" and its "components" (secrecy, helplessness, accommodation, delayed disclosure, retraction, and denial) are generally inadmissible at trial because, except for delayed disclosures, there is no consensus among experts for each component. *State v. J.L.G.*, 190 A.3d 442, 458-65 (N.J. 2018), *holding modified, State v. Olenowski*, 289 A.3d 456, 468-69 (N.J. 2023) (explaining that while the court previously relied on the standards in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), for its determination in *J.L.G.*, it was now adopting a standard more akin to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to determine the admissibility of expert testimony in criminal cases).

¶ 56    As for Giragosian, Wuthrich argues that her testimony that abused children exhibit "symptomology" lacks scientific support. But we have already addressed the night terrors concern and Giragosian's testimony.

¶ 57    Wuthrich argues that with proper investigation of the experts, Stayton "could have challenged their opinions through pretrial *Shreck* litigation" or by calling defense experts. *See People v. Shreck*, 22 P.3d 68 (Colo. 2001). But Stayton, based on his experience, reasonably predicted that these witnesses would be permitted to testify as experts and effectively cross-examined them to challenge their testimony and buttress the defense's case theory. His performance was not unreasonable. *See Newmiller*, ¶ 60; *Strickland*, 466 U.S. at 688-89.

¶ 58    For example, Stayton cross-examined James-Banks about the proper criteria for interviewing child abuse victims; concerns with suggestibility, false allegations, and leading questions; and whether her interviews conformed to these criteria. Stayton also challenged James-Banks' testimony that divorce has no impact on rates of false allegations, testimony Wuthrich challenges on appeal, by pointing out that forensic interview guidelines ask interviewers to

26

investigate further when only one parent believes abuse occurred. Stayton also questioned whether the victims' evolving allegations against Wuthrich could signal confabulation.

¶ 59 Further, even if Stayton should have challenged the experts via *Shreck*, there is no reasonable probability that the outcome would have differed because the experts would likely have been permitted to testify. *See Strickland*, 466 U.S. at 691-92, 694; *see also Shreck*, 22 P.3d at 77 (CRE 702 does not demand that expert testimony be unchallenged by the scientific community or reflect a general consensus on the issue; CRE 702 is intended to be flexible); *People v. Cooper*, 2021 CO 69, ¶ 53 ("While generalized expert testimony must fit the case, the fit need not be perfect. In other words, each aspect of such testimony need not match a factual issue. . . . [T]he fit inquiry must be flexible.").

¶ 60 The admission of scientific evidence is a "flexible, fact-specific" inquiry that "contemplates a wide range of considerations that may be pertinent to the evidence at issue." *Shreck*, 22 P.3d at 77. Such an inquiry may include "whether the technique has been generally accepted" by the scientific community, but CRE 702 focuses on the "reliability and relevance of the scientific evidence" and requires "a

determination as to (1) the reliability of the scientific principles; (2) the qualifications of the witness; and (3) the usefulness of the testimony to the jury." *Shreck*, 22 P.3d at 77-79.  And testimony about the general characteristics of child sexual abuse victims has long been admitted in Colorado courts, before and after Wuthrich's trial.  *See, e.g., People v. Gillispie*, 767 P.2d 778, 780 (Colo. App. 1988) ("It is proper, for instance, to elicit an opinion as to whether children, in general, have the sophistication to lie about having experienced a sexual assault."); *People v. Gaffney*, 769 P.2d 1081, 1086 (Colo. 1989) (collecting cases demonstrating where expert testimony about general characteristics of child victims was permitted); *People in Interest of J.R.*, 2021 COA 81, ¶ 20 ("[A]n expert in a child sexual assault case can testify about the general characteristics and behavior of sexual abuse victims . . . .").

¶ 61    As a result, Wuthrich suffered no prejudice.  At most, based on the record before us, James-Banks' testimony and the study Wuthrich highlights show there is disagreement in the field about these issues.  But this would not have made the evidence inherently inadmissible.  CRE 702's flexibility and Colorado's long acceptance of such evidence, *see Shreck*, 22 P.3d at 77-79; *see also J.R.*, ¶ 20,

28

supports the conclusion that Stayton's decision not to challenge this evidence before trial was reasonable. Thus, we discern no error in the postconviction court's findings.

### D. Bolstering Testimony

¶ 62 Next, Wuthrich argues that Stayton was ineffective because he failed to object to expert testimony that improperly bolstered the victims' credibility. Specifically, he argues that Celeste Gammelin, a forensic interviewer, improperly testified on redirect that it was a "good thing" M.C. responded with "I don't know" to questions about the alleged abuse because when children "are lying . . . about sex abuse, which they don't have the knowledge about, . . . they often . . . wouldn't say 'I don't know,' they would make up another lie to fill in that information for me." Wuthrich also challenges Giragosian's testimony that she was not surprised L.W. said she could not remember or denied that abuse had occurred in court because court can be intimidating and James-Banks' testimony that "85 percent" of children initially deny abuse occurred.

### 1. Postconviction Testimony and Findings

¶ 63 Stayton testified at the postconviction hearing that he did not object to these experts' challenged testimony at trial but that he

should have.  The postconviction court found that Stayton objected to some testimony at trial, and "he may not have done it every time, but he did use his discretion in making objections," but his objections were overruled.  The court found that Stayton's performance was not deficient and rejected the claim.

## 2. Analysis

¶ 64    The improper bolstering testimony that Wuthrich now challenges in connection with his ineffective assistance claims was addressed in his prior direct appeal from 2011.  A division of this court concluded that none of this testimony was improper because it properly related to child victims' general characteristics. *Wuthrich*, No. 08CA0972, slip op. at 10-15, 18-22; *see People v. Relaford*, 2016 COA 99, ¶ 28 ("'[A]n expert may testify as to the typical demeanor and behavioral traits displayed by a sexually abused child.' This type of testimony is generally admissible because it assists the jury in understanding the victim's behavior after the incident — why the victim acted the way he or she did.") (citation omitted); *see also Cooper*, ¶¶ 67-74.

¶ 65    The current challenge is slightly different because Wuthrich now contends that Stayton's performance was unreasonable

because he failed to object. While conceding that experts may testify about victim characteristics generally, Wuthrich argues he was harmed by this error because the case hinged on the victims' credibility.

¶ 66    We agree with the postconviction court, however, and conclude that Stayton's performance was reasonable. "Effective assistance of counsel, as guaranteed by the sixth amendment, does not require an attorney to object to every possible error." *People v. Bossert*, 722 P.2d 998, 1010 (Colo. 1986). Indeed, as the postconviction court noted, Stayton exercised discretion in objecting. For example, after Giragosian's challenged testimony Stayton objected for speculation when the prosecution asked if a child might feel more comfortable in court "if she got to know all of us fairly well and trust us over a period of five months?" as a child would have in therapy. Stayton also objected to a portion of Gammelin's testimony when the prosecution asked, "Is it your job to also try and determine if you're receiving truthful content?" Stayton objected, arguing that Gammelin "cannot testify whether statements are truthful or not," and the court sustained the objection.

¶ 67    That Stayton chose not to object to the specifically challenged testimony, however, was not unreasonable.  This is especially true given that, as the prior division held in Wuthrich's direct appeal and Wuthrich concedes in this appeal, experts may generally testify to the general characteristics of child sexual assault victims.  *See, e.g., Relaford,* ¶ 28; *J.R.,* ¶ 20.  Had Stayton objected to the specific challenged testimony, there is not a reasonable probability that the outcome of trial would have been different because the objections would likely have been overruled.

¶ 68    Stayton was not ineffective for failing to object to the challenged testimony.  *See Strickland,* 466 U.S. at 688-89.  This is particularly true in light of the prior division's conclusion that the challenged testimony was proper.  *Wuthrich,* No. 08CA0972, slip op. at 10-15, 18-22; *see also Relaford,* ¶ 28.  The postconviction court did not err.

## E.    Child Hearsay

¶ 69    Next, Wuthrich contends Stayton was ineffective because he failed to challenge the admission of child hearsay evidence.

32

## 1. Testimony at Trial

¶ 70    The prosecution filed pretrial notices of intent to introduce child hearsay evidence, and the court held two hearings on the issue.

¶ 71    In September 2007 the court held a hearing to admit child hearsay statements, through C.C.'s and M.C.'s mothers, detailing the disclosures the victims made to them. At the end of these witnesses' testimony Stayton stipulated to the admissibility of M.C.'s hearsay testimony in a forensic interview with a detective. He then stated in regard to M.C.'s and C.C.'s testimony: "Normally, occasionally, I object to this kind of testimony; but candidly, we'd like to introduce this testimony." Stayton added that "I just want to make a record, because we as defense lawyers are constantly second-guessed, . . . I understand [section] 13-25-219[, C.R.S. 2007], and I'm making a conscious decision here that I want this testimony in." He also stated, "I'm not sure, frankly, it meets the standard of [section] 13-25-129 because the multiple views, suggestibility, et cetera, but we want it in." Stayton stipulated to the safeguards of reliability in section 13-25-129(1)(a), C.R.S. 2007.

33

¶ 72 The trial court then found that the statements (1) were not made with a specific concern about the defendant and were "spontaneous" in that sense, "although we know some of them were made in response to generalized safety conversations with all the children and the parents"; (2) were not made while the children were in pain from alleged abuse but while clearly upset given their demeanor; (3) used appropriate language for young children; (4) mostly were not the result of leading questions; and (5) were made without indication of bias by the children against the defendant. Thus, while the court noted that there were "a number of events which occurred between the times of the alleged abuse and the times of the statements," ultimately it accepted the stipulation because the circumstances provided "sufficient safeguards of reliability."

¶ 73 In November 2007, the trial court held another hearing concerning the victims' child hearsay to forensic interviewers and therapists (Giragosian, Gammelin, and Jennifer Martin, a forensic interviewer). Stayton again stipulated to the admissibility of these statements, noting that "we would be calling these people ourselves anyway." He added that "we agree[] these meet 13-25-129

34

requirements," but the defense did not believe they would be "admissible at trial" on all bases and could become cumulative.

¶ 74    The court, after viewing recordings of the interviews, found that the children's statements (1) were not made spontaneously; (2) used age-appropriate language; and (3) were overwhelmingly not made in response to leading questions.  As a result, the court found that the children's statements had "sufficient safeguards of reliability" to be admitted at trial.  As to L.W.'s statements in therapy, it noted that the psychologist-patient privilege had been waived for L.W.'s statements to Giragosian but that there was no recording of these statements to independently review; therefore it admitted the hearsay because Stayton had not objected.

2.    Postconviction Testimony and Findings

¶ 75    In the postconviction hearing Stayton explained that he stipulated to the hearsay statements' admissibility because "[t]hey were going to come in anyway" and he believed the statements met the statutory requirements for reliability.  On cross-examination, Stayton agreed the hearsay statements would have come in as prior inconsistent statements.

¶ 76    The postconviction court found that, while an argument could be made that this was a part of Stayton's trial strategy, Stayton should have moved to exclude the hearsay and that the failure to do so was deficient.  But the court also found that "looking at the totality of the circumstances and considering that there are other exceptions to the hearsay rule," it could not "find that the defendant was deprived of a fair trial because likely all [of] those statements were coming in.  They could come in under impeachment, inconsistent statements, the residual hearsay exception, as well as child hearsay."  Furthermore, the decision not to challenge the children's hearsay statements was part of the defense's strategy "to highlight the inconsistency in the statements."  As a result, the court rejected the claim.

### 3.    Analysis

¶ 77    Wuthrich argues that Stayton was ineffective for stipulating to the admissibility of statements that (1) L.W. made in forensic interviews and to Giragosian; (2) C.C. made in forensic interviews and to her parents; and (3) M.C. made to her mother, police, and Gammelin.  Wuthrich argues that, while the court correctly found Stayton's performance was deficient, it misapplied the law by

36

finding that he was not deprived of a fair trial. Wuthrich argues that he was harmed by the statements' admission because their exclusion would have undermined the prosecution's case and made his acquittal more likely.

¶ 78 We conclude that Stayton acted reasonably by stipulating to the admissibility of these statements and therefore disagree with the postconviction court's conclusion that Stayton's performance was deficient because he did not attempt to exclude the statements. But we agree with the postconviction court that, regardless, Wuthrich was not prejudiced because the statements were likely admissible, so there is not a reasonable probability the outcome of the case would have differed.

¶ 79 Stayton testified at both motions hearings that he wanted to probe the hearsay statements. At the September hearing he stated explicitly that he wanted the testimony to be admitted and that this was a conscious decision. And at the November hearing he stated that the defense would have called the witnesses "anyway." In both hearings the trial court independently reviewed the challenged testimony and found that it enjoyed sufficient safeguards of

reliability to allow admission, though it could not independently review a recording of L.W.'s statements to Giragosian.

¶ 80     All the victims testified at trial, and the trial court simply needed to find that "the time, content, and circumstances of the statement[s] provide sufficient safeguards of reliability," justifying the application of the child hearsay exception. § 13-25-129(1)(a), C.R.S. 2007; *see also* § 13-25-129(5)(a), C.R.S. 2024. To make this determination the trial court looked to the factors provided in *People v. Trujillo*, 923 P.2d 277, 282 (Colo. App. 1996), and while it found that not all factors had been established, most supported admission of the testimony. *See People v. Rojas*, 181 P.3d 1216, 1219 (Colo. App. 2008) ("Failure to establish all factors favoring admission does not foreclose the admissibility of a statement."). The record supports the trial court's determinations, and a "trial court's findings concerning reliability of a child-victims' out-of-court statements will not be disturbed on appeal if they are supported by the record." *Trujillo*, 923 P.2d at 282. This also applies to the statements L.W. made to Giragosian, as Giragosian's trial testimony indicates that the hearsay testimony was supported by sufficient safeguards of reliability. *See Rojas*, 181 P.3d at 1219 (while the

trial court should make specific findings on the statements at issue, "its decision to admit the child's hearsay statements will be affirmed even absent such findings if the record shows an adequate factual basis to support the trial court's determination").

¶ 81 In sum, Stayton reasonably predicted that the statements would have been admissible at trial anyway and reasonably concluded that the inconsistencies in the statements would aid the defense; thus it was not unreasonable for Stayton to make a strategic decision to stipulate to their admissibility. *See Bossert*, 722 P.2d at 1010; *see also Sharp*, ¶¶ 31-33 (where defendant alleges counsel was ineffective for failing to file a motion, he "must demonstrate actual *Strickland* prejudice by proving that the motion would have been granted"). Indeed, Stayton needed these hearsay statements to be admitted at trial to argue the defense's theory of the case. Without referencing when the victims did and did not accuse Wuthrich of abuse, the defense would not have been able to highlight the long period between the first discoveries of the victims' inappropriate behavior and the disclosures of abuse, which the defense used to argue that the allegations against Wuthrich were false.

¶ 82    Furthermore, the defense's strategy would have allowed the statements to be admitted as prior inconsistent and consistent statements — by the prosecution to rehabilitate witness testimony or by the defense for impeachment. *See People v. Eppens*, 979 P.2d 14, 22 (Colo. 1999) (the admission of a child sexual assault victim's "prior consistent statements was necessary to give the jury an appropriately complete picture of her credibility as a witness" after the defense sought to undermine the victim's credibility by highlighting inconsistencies); *see also People v. Elie*, 148 P.3d 359, 362 (Colo. App. 2006) ("A prior consistent statement is also admissible for rehabilitation after a witness has been impeached by a prior inconsistent statement."); *People v. Aldrich*, 849 P.2d 821, 826 (Colo. App. 1992) (child sexual assault victim's hearsay statements were admissible as prior inconsistent statements where the declarant was available to testify).

¶ 83    Collectively, because the victims' hearsay statements were likely admissible under section 13-25-129, C.R.S. 2007, and contained prior consistent and inconsistent statements, it was reasonable for Stayton to rely on his experience to stipulate to their admissibility. *See Bossert*, 722 P.2d at 1010. And regardless,

40

Wuthrich suffered no prejudice where some of the statements supported his defense.  *See Sharp*, ¶¶ 31-33.

### F.  Victims' Competency

¶ 84    Next Wuthrich argues that Stayton was deficient because he failed to challenge the young victims' competency to testify at trial.

### 1.  Testimony at Trial

¶ 85    The prosecution began each victim's direct examination with a brief competency examination using largely identical questioning.  For example, the prosecution asked L.W. if she knew her age, the name of her father, the names of the other victims, and information about her family.  The prosecution then asked if L.W. recognized and knew the colors of various markers, if L.W. knew the difference between a truth and a lie, and what it meant to tell the truth.  The prosecution asked L.W. to demonstrate her understanding by showing that she understood it would be a lie to agree that a red marker is yellow, while it would be truthful to agree a yellow marker was yellow.  The prosecution also asked each victim to promise to tell the truth before they began their substantive testimony.  The defense did not object to this questioning.

## 2.     Postconviction Testimony and Findings

¶ 86     At the postconviction hearing Stayton testified that he chose not to challenge the victims' competency because, based on his experience, he expected the children would be found competent to testify.

¶ 87     The postconviction court found that while Stayton did not request a competency hearing, the prosecution's "short competency hearing[s] prior to getting into anything substantive" at trial were appropriate and "highlighted that they were competent to testify." The court further noted that Stayton made a strategic decision to "meet the children in the courtroom for the first time at the time of trial," rather than allow the children to become familiar with him by asking questions about their competency or the admissibility of their statements.

## 3.     Analysis

¶ 88     Wuthrich argues that Stayton's explanation for not challenging the children's competency was not based on investigation or research. Wuthrich also argues the court improperly credited Stayton's strategy explanation.

¶ 89     We agree with the postconviction court that Stayton's decision

not to challenge the victims' competency was a reasonable strategic

decision based on his experience.  *See Newmiller,* ¶ 60.  Further,

Wuthrich was not prejudiced; even if Stayton had demanded a

competency hearing, there is no reasonable probability that the

outcome of trial would have differed.  *Strickland,* 466 U.S. at 691-

92.  Stayton's decision proved to be reasonable given that the

prosecution sufficiently demonstrated at the beginning of each

victim's testimony that they could relay information about

themselves and their families, understood the difference between

truth and lies, and promised to tell the truth.  *See People v. Collins,*

2021 COA 18, ¶ 30.

¶ 90     Stayton was experienced trial counsel who reasonably chose to

question the victims for the first time at trial.  *See Newmiller,* ¶ 60,

*Strickland,* 466 U.S. at 688-89.  And the trial court allowed the

victims to testify after they demonstrated their competence, so

Wuthrich suffered no prejudice.  *See Strickland,* 466 U.S. at 691-

92.

## G. Conflicted Representation

¶ 91    Next, Wuthrich argues that Stayton had a conflict of interest because he was training with the National Guard before trial.

### 1. Postconviction Testimony and Findings

¶ 92    Stayton testified that when he worked on Wuthrich's case he was a National Guard staff sergeant and knew there was a "possibility of being deployed" when he was hired in April 2007. But he testified that he was permitted to maintain private employment. He received "state" orders in September 2007, which required him to begin active duty and attend in-person training in Arkansas from October 1, 2007, until January 1, 2008. And Stayton knew he could be deployed again under "federal" orders at the beginning of January and was later deployed overseas in March 2008.

¶ 93    Stayton testified that his duties made him unavailable for two weeks in October, requiring rescheduling of the trial, and another two weeks at the end of November through early December. Trial began on December 17. Stayton testified that his training in this entire period was not "really substantial," he had "a lot of down time," and training did not prevent him from preparing for trial.

¶ 94    Stayton testified that he received leave "most" weekends to return to Colorado, and during the week if needed, that he returned to Colorado in October for one day and "several" times in November and was "going home frequently," and that he was able to work on Wuthrich's case in his downtime. Stayton also testified that Wuthrich was aware of the deployment and agreed to Stayton remaining on the case, even after Stayton offered to connect Wuthrich with a different lawyer. However, Stayton never asked Wuthrich to sign a written waiver. Stayton insisted that his Arkansas deployment "did not interfere" with his representation of Wuthrich and that he had "plenty of time" for his case.

¶ 95    As relevant to the allegations that Stayton failed to review and familiarize himself with discovery and failed to obtain "necessary documents," the postconviction court found that the only times Stayton's military service could have conflicted with his representation of Wuthrich was at the September 2007 motions hearing where he failed to "put up a fight as to the child hearsay." Henslee testified that she thought Stayton did not cross-examine witnesses at the hearing because he may have had a speaking engagement to go to, though she added that "aside from that . . .

45

[h]e was totally engaged in this case." Stayton rejected any suggestion that he did not challenge the child hearsay issue because of a lack of time.

¶ 96 The postconviction court found that Stayton had not acted deficiently and that he properly obtained and reviewed documents for trial. The court noted that it "was very clear to the Court . . . how invested [Stayton] was in Mr. Wuthrich at the time of trial and how invested he is in Mr. Wuthrich at [the postconviction hearing]." As a result, it rejected the claim that Stayton's military service created a conflict.

## 2. Analysis

¶ 97 Wuthrich contends that Stayton knew he could be called to active duty. He says that while Stayton advised him of that possibility, Wuthrich never signed a conflict waiver, and Stayton's duties in the National Guard prevented him from adequately preparing for the case. Wuthrich argues that the conflict caused Stayton to forgo reasonable alternative strategies and adversely affected the representation.

¶ 98 We agree with the postconviction court. We have found no evidence in the record demonstrating that Stayton acted under an

46

actual conflict of interest preventing him from adequately preparing for — and representing Wuthrich at — trial. Stayton did mention in the September 2007 hearing that he was concerned they would be unable to finish in time as he had another hearing at 1:00pm that could not be rescheduled because he had "to catch a plane at 4:00." But these limited comments do not establish that Stayton's military service created an actual conflict.

¶ 99 When reviewing allegations that defense counsel was "burdened by an actual conflict of interest," courts employ a limited "presumption of prejudice" "if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland,* 466 U.S. at 692 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 348, 350 (1980)). "[A]n actual conflict of interest [is] one that is 'real and substantial.'" *People v. Harlan,* 54 P.3d 871, 878 (Colo. 2002) (citation omitted). But "the possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler,* 446 U.S. at 350.

¶ 100 Wuthrich has only demonstrated that there was, at best, a possibility that Stayton might have been conflicted. And Wuthrich

47

essentially contends that Stayton was too busy to prepare for trial instead of alleging that he operated under an actual conflict, and even this allegation is tenuous. Wuthrich highlights many issues he contends demonstrates that Stayton was conflicted, such as his alleged failures to prepare for expert testimony or stipulating to the admission of the child hearsay evidence. But these contentions are conclusory and do not show that Stayton operated under an actual conflict of interest that adversely affected his performance. *See id.* at 348, 350. These issues are largely reasonable strategic trial decisions that Wuthrich now challenges in hindsight.

¶ 101 Stayton was the first to state that he felt he could have been more effective at trial, but he was adamant that his military service had not affected his representation of Wuthrich. To the contrary, he testified that his duties during training were not all that substantial or physically exhausting, he had a great deal of downtime that allowed him to work on Wuthrich's case, he returned to Colorado frequently during the week and on weekends, and he kept the trial court and Wuthrich informed about his military duties. The postconviction court did not err.

## H. Failure to Present Exculpatory Evidence

¶ 102    Wuthrich next argues Stayton acted deficiently because he failed to present certain evidence.  Stayton testified that the decision to not introduce additional evidence or witnesses was mostly because of the children's surprising recantations, and he wanted to "get the case to the jury" quickly to avoid the prosecution being able to "rehabilitate" its case by questioning additional witnesses.  Wuthrich contends that the postconviction court erred by crediting Stayton's unreasonable explanation for not introducing this evidence at trial.

### 1. M.C.'s and C.C.'s Therapy Records and Interview Recordings

¶ 103    Wuthrich contends that Stayton should have introduced therapy records for M.C. and C.C.  Wuthrich further argues that Stayton should have introduced video of other interviews where the victims denied abuse occurred.

¶ 104    Stayton testified in the postconviction hearing that he was unsure if he had therapy records for C.C. and M.C.  Stayton also testified that he was able to introduce evidence of L.W.'s therapy sessions because Wuthrich, as L.W.'s father, signed a release for

these records.  But M.C.'s and C.C.'s therapy records were privileged.

¶ 105    Stayton also testified that — instead of admitting videos of interviews where no disclosures occurred — he created an exhibit that summarized all of L.W.'s therapy visits with Vicki Fly, L.W.'s first therapist, and Giragosian and pointed out when the outcries were made.  Further, he felt admitting other videos without disclosures "drags out the case," especially as he had cross-examined other witnesses about these interviews.  Stayton also testified that admitting video of the examinations could have bolstered the prosecution's case.

¶ 106    The postconviction court found that Wuthrich, as L.W.'s father, could allow access to L.W.'s therapy records.  But no such possibility existed for M.C.'s and C.C.'s therapy records because he could not waive their privilege, and thus it was reasonable not to seek these records.  We agree.

¶ 107    Wuthrich provides no theory under which Stayton could have obtained M.C.'s and C.C.'s privileged therapy records, *see* § 13-90-107(1)(g), C.R.S. 2024, other than those that formed the basis of a child abuse report.  *See People v. Sisneros*, 55 P.3d 797, 800 (Colo.

50

2002) ("[T]he psychologist-patient privilege protects testimonial disclosures as well as pretrial discovery of files or records derived or created in the course of the treatment. . . . Defendant bears the burden of establishing a waiver of the privilege . . . ."); *see also* §§ 19-3-311(1), -304(1)(a), (2)(p), C.R.S. 2024.

¶ 108    As for videos of interviews where the victims did not make disclosures, it was reasonable for Stayton to strategically decide not to admit these because they would have unnecessarily dragged out the case and would have subjected witnesses to potentially damaging examination without much benefit. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ."); *see also Dunlap v. People*, 173 P.3d 1054, 1075 (Colo. 2007) ("If trial counsel had a reasonable basis for a strategic decision, then the decision enjoys a strong presumption of correctness and the inquiry is generally at an end.").

¶ 109    Furthermore, Stayton elicited testimony from witnesses that the victims did not make disclosures in earlier interviews and that there was substantial time between when the victims initially began therapy and were interviewed and when they made the allegations

51

against Wuthrich. Indeed, this was a major theme of the defense's case. And as Stayton pointed out, he specifically made exhibits showing the jury that L.W. had been in therapy with Fly and Giragosian for an extended period before she disclosed the abuse and that in many sessions she did not make any such allegations. Introducing other videos may well have been cumulative.

¶ 110 Collectively, Stayton acted reasonably and the postconviction court did not err.

### 2. Spiegle's Attendance at Trial

¶ 111 Wuthrich next contends that Stayton should have required Dr. Richard Spiegle, the defense's forensic interview expert, to sit through additional testimony at trial, but because he did not, Spiegle was later unable to adequately respond to the prosecution's expert's testimony. Wuthrich alleges that Stayton made the decision for personal financial reasons.

¶ 112 Stayton testified at the postconviction hearing that, to support the defense's theory of the case, he elicited testimony from Spiegle about (1) concerns with the forensic interviews, including a statement that a victim's parent "helped" her remember;

52

(2) repeated therapy sessions in which adults pressed the children for answers; and (3) whether the parents influenced the children.

¶ 113    The record supports that Stayton effectively elicited testimony concerning problems Spiegle believed occurred in the victims' forensic interviews.  For example, Spiegle discussed the guidelines for forensic interviews with children and stated that, in his opinion, the forensic interviews he reviewed did not meet these criteria.  He testified that he believed the interviewers "mischaracterized" what the victims said, improperly asked the same questions repeatedly, and failed to follow up when the victims told interviewers they knew about things because "people told" them.  Spiegle also said it was a "red flag" when only one parent believes abuse occurred and repeatedly asks the child about the perceived abuse over long periods of time because children are susceptible to suggestions.

¶ 114    Stayton testified at the postconviction hearing that he did not further follow up on this questioning because, again, he wanted to "get the stuff out" after the children recanted allegations of abuse. Stayton also testified that he felt that the defense had already made "great headway" through Spiegle's testimony and Giragosian's and

James-Banks' cross-examinations and that he had successfully advanced Wuthrich's case.

¶ 115    The postconviction court found that it was part of Stayton's trial strategy to not have Spiegle sit through unnecessary testimony, especially given his experience working with Spiegle and his familiarity with the testimony he planned to elicit.  We agree with the postconviction court's rejection of the claim.

¶ 116    In essence, Wuthrich's claim on appeal is that Stayton should have used Spiegle to elicit testimony on the studies and evidence Wuthrich highlighted in Part III.C.2 (above).  But Spiegle was admitted as an expert for a particular purpose — to call out perceived problems with the victims' forensic interviews.  And Stayton effectively elicited testimony on this subject.  That Spiegle did not sit through all of trial to hear the testimony that Wuthrich, in hindsight, now argues he should have been able to respond to does not render Stayton's performance ineffective.  Nor was Stayton ineffective for strategically choosing to move the case forward so the jury could begin deliberations.  At the time, Stayton believed that the trial was going well — a decision he made in light of his experience.  *See Newmiller,* ¶ 60; *Strickland,* 466 U.S. at 688-89.

¶ 117 Stayton's decision to not have Spiegle sit through all of the trial was a reasonable strategic decision, and the postconviction court did not err.

### 3. Additional Potentially Helpful Witnesses

¶ 118 Wuthrich also contends Stayton should have called L.W.'s pediatrician, Dr. Robert Bucknam, and Emily Griffis, a court-appointed evaluator for visits between Wuthrich and L.W. during Wuthrich's divorce case, contending both would have offered helpful testimony. Wuthrich also contends Stayton should have called Fly to testify because he told the jury in opening statements that it would hear from her.

¶ 119 Stayton testified that Griffis submitted a report during the divorce stating that, in the time period in which the assaults allegedly occurred, she had no concerns about Wuthrich and L.W. Stayton could not recall why he did not call Griffis to testify. But he testified that he did not call Bucknam because "[a]ll he could testify to is that there was no physical findings" and Stayton did not think this would be helpful.

¶ 120 Stayton also testified that he chose not to call Fly to testify, or introduce videos of her therapy sessions with L.W., because he

55

wanted to get the case to the jury quickly and believed he had enough information through other witness testimony. Additionally, he had examined Fly before and believed she had "an agenda."

¶ 121 The postconviction court found that the decision not to call these witnesses was a deliberate decision given "what had happened on the stand, what had been elicited, what had been conceded," especially after the victims recanted on the stand. Thus, the court rejected the claim as one "based in hindsight" and found there was no basis for a new trial. We agree.

¶ 122 "Whether to call a particular witness is a tactical decision, and, thus, a matter of discretion for trial counsel." *Davis v. People*, 871 P.2d 769, 773 (Colo. 1994); *see also Strickland*, 466 U.S. at 690. Stayton felt that trial was going well and wanted to get the case to the jury without allowing the prosecution to rehabilitate its case with Griffis' and Bucknam's testimony. This was a reasonable strategic choice made in light of Stayton's experience. *See Newmiller*, ¶ 60; *Strickland*, 466 U.S. at 688-89.

¶ 123 This is true even with respect to Fly, who was named in Stayton's opening statement. After the defense detailed that L.W.

first began therapy after meeting with detectives in March 2006, Stayton stated,

> Who do they choose as a therapist? They choose Vicki Fly. You'll hear from Vicki Fly. We're going to bring her in. Vicki Fly used to be a forensic interviewer. Her job was to get children to discuss issues of abuse. . . . In July of '05 after 22 therapy sessions with Vicki Fly, a former forensic interviewer [L.W.] is still saying, [n]othing happened with dad. So what happens? Vicki Fly leaves that particular position. She refers [L.W.] to a Susan Giragosian.

¶ 124    Thus, Fly's purpose would have primarily been to show that L.W. had been in therapy well before L.W. made her first disclosures in therapy with Giragosian. Even if failing to call a witness mentioned in opening statements may prejudice a defendant, Wuthrich points to no specific crucial testimony that was omitted. *See Dunlap*, 173 P.3d at 1075-76 ("[F]ailing to produce evidence promised in the opening statement can be an unreasonable and prejudicial decision which denies a defendant the effective assistance of counsel. Determining whether the failure to call a promised witness is ineffective assistance of counsel is necessarily fact-based.") (citations omitted).

¶ 125   Stayton strategically decided not to call Fly, believing she could damage Wuthrich's case without much benefit.  The point he sought to make — that L.W. had been in therapy with Fly for a long time before L.W. first disclosed abuse — was admitted through the defense's exhibits and witness testimony concerning L.W.'s therapy sessions.  *See id.* at 1075 ("The course of a trial can affect and alter an original defense strategy, and may lead to reasonable decisions not to call witnesses who were mentioned in the opening statement.").

¶ 126   Finally, even assuming Stayton was ineffective for failing to call these witnesses, Wuthrich points to no specific evidence Stayton could have elicited that creates a reasonable probability that the outcome of trial would have differed had they testified; thus he was not prejudiced, and the postconviction court did not err.  *See Strickland*, 466 U.S. at 694.

### 4.   D.C.'s Bias

¶ 127   Wuthrich next contends that Stayton told the jury it would hear evidence concerning D.C.'s "agenda" but failed to cross-examine her about her conduct during the divorce proceedings.

¶ 128    Wuthrich points to the original postconviction petition for factual support of D.C.'s bias.  But in the postconviction hearing, little testimony was elicited on the subject of D.C.'s bias and the divorce.  There were brief mentions of a "divorce binder" that Wuthrich's mother prepared, which Stayton said he had and which showed, as the prosecution's postconviction counsel put it, that "the divorce was not precipitated because of the [solicitation] conviction."  In fact, Wuthrich and D.C. "actually reconciled after that conviction."

¶ 129    Instead, it was "finding pornography that led to the divorce," and "the binder contained information about the type and volume of pornography the defendant had."  Stayton testified that he did not want to use the binder at trial "because he was concerned about explaining the pornography," and "about opening the door."  Klein, Wuthrich's legal expert at the postconviction hearing who "crystallized" Wuthrich's claims, testified that this binder may have also contained a summary of Wuthrich's "pornography habit" that included mentions of oral sex, other "bad acts," and the solicitation case.

¶ 130    The postconviction court found that Stayton used "sound trial strategy and discretion as to what to cross-examine on, how long to conduct the cross-examination, and what would be effective" when examining D.C. given the totality of the circumstances and the evidence already elicited.  We agree.

¶ 131    "[D]ecisions concerning whether and how to conduct cross-examination are strategic ones committed to counsel's discretion." *People v. Smith*, 2022 COA 56, ¶ 31 (citing *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008)), *rev'd on other grounds*, 2024 CO 3.  Stayton effectively cross-examined D.C. at trial about her reasons for separating from Wuthrich, why she thought Wuthrich assaulted L.W., and her decisions to put L.W. into therapy.  For example, Stayton cross-examined her about her motivations for filming the night terrors video and whether she prepared it "with court in mind" and her reasoning for not telling the pediatrician.  Stayton also cross-examined D.C. about her decision to send L.W. for further sexual assault examinations when her pediatric exam was "normal," as were other examinations.  Stayton also asked D.C. whether she was "convinced" that Wuthrich assaulted L.W. because of the allegations in the solicitation case.

¶ 132　All of this is to say that Stayton's decision not to cross-examine D.C. about her potential biases based on issues in the divorce case was a reasonable strategic decision.　*Id.*　That Wuthrich now disagrees with this approach in hindsight does not render Stayton ineffective.　*See Strickland*, 466 U.S. at 688-90.

## I.　Cumulative Error

¶ 133　Finally, Wuthrich argues that collectively these alleged errors — even if they do not merit reversal and a new trial in isolation — constitute cumulative error that requires reversal because, together, they undermined his defense and strengthened the prosecution's weak case.

¶ 134　The postconviction court looked to "two potential avenues for cumulative" error: Stayton's military service commitments and the admission of certain prejudicial evidence.　The court, again, rejected the idea that Stayton was ineffective because of his military service commitments, finding there was no basis for this claim and that Stayton was dedicated to Wuthrich's case.　As for prejudicial evidence, the court found that when looking without hindsight to the totality of the evidence presented to the jury, both prejudicial and corroborating, it could not "find that there was a reasonable

probability that but for counsels' professional errors, . . . the result of this proceeding would have been any different." It noted that "[i]t is not this Court's job to undo a decision made by a jury absent of finding a deficient performance." Thus, the court rejected the claim for cumulative error.

¶ 135 We conclude that none of Wuthrich's claims for ineffective assistance of counsel have merit because, with respect to each allegation, we either conclude that Stayton acted reasonably or Wuthrich suffered no prejudice. Therefore, we reject Wuthrich's claim that any of these errors, in isolation or cumulatively, warrant reversal and a new trial. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25 ("For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. Stated simply, cumulative error involves cumulative prejudice.") (citation omitted).

IV. Disposition

¶ 136 We affirm the postconviction court's order.

JUDGE HARRIS and JUDGE SCHUTZ concur.